FORBES v. BUTLER et al.

No. 4277.   Decided December 14, 1925.   Rehearing denied February 4, 1926.   (242 P. 950.)

1.  APPEAL AND ERROR—IN EQUITY CASE, SUPREME COURT REVIEWS EVIDENCE, AND DETERMINES CASE ACCORDING TO FACTS FOUND BY IT.  In equity case, it is incumbent on Supreme Court to review evidence, and decide case according to facts as it finds them, bearing in mind presumptions in favor of judgment.

2.  JOINT ADVENTURES—EVIDENCE HELD TO ESTABLISH A JOINT VENTURE FOR SALE OF OPTION ON LAND HELD BY ONE OF PARTIES THERETO.  Evidence *held* to establish a joint venture for sale of option on land held by one of parties thereto, by evidence that was definite, certain, and free from ambiguity, as required in such cases.

3.  JOINT ADVENTURES—"JOINT VENTURE" IS IN NATURE OF PARTNERSHIP, SUBJECT TO LAW OF PARTNERSHIP SO FAR AS SUBSTANTIAL RIGHTS ARE CONCERNED.  A "joint venture" is in nature of

---

Corpus Juris-Cyc. References.
[1]   Appeal and Error, 4 C. J. pp. 897 n. 81; 898 n. 86.
[2]   Joint Adventure, 33 C. J. p. 871 n. 21.
[3]   Joint Adventure, 33 C. J. p. 842 n. 5, 6, 13.

partnership ordinarily, but not necessarily, limited to a single transaction, and subject to law of partnership so far as substantial rights are concerned.

Appeal from District Court, Fifth District, Iron County; *T. H. Burton*, Judge.

Suit by Raymond T. Forbes against William W. Butler and others. Judgment for defendants and plaintiff appeals.

JUDGMENT REVERSED AND RENDERED, and cause remanded with directions.

*Walton, Walton & Nelson* and *Fisher Harris*, all of Salt Lake City, for appellant.

*Sam Cline*, of Milford, for respondents.

THURMAN, J.

The complaint, in substance, alleges that in October, 1922, plaintiff and defendant Butler, hereinafter called Butler, entered into a joint venture for the disposal of a certain option which Butler held for the sale of 11,040 acres of land situated in Iron county, Utah. The lands were owned by the Iron Springs Sheep Company, hereinafter called the corporation.

Plaintiff alleges that the agreement between him and Butler was that they were to use their joint efforts to dispose of the land at a profit, and were to share equally in the expenses incident thereto and in the profits, and that they each made efforts and incurred expenses in that behalf; that a purchaser was found by said parties at a gross profit of $10,000, of which Butler had received $5,000 and the corporation the remainder of the purchase price, except the sum of $22,500; that the corporation conveyed the property to said purchaser and took a note and mortgage thereon for $27,500, which mortgage secured payment of the sum of

$5,000 to be paid Butler by the corporation; that Butler
has made no accounting for the money received by him, has
refused to account to plaintiff, and has repudiated and dis-
avowed the joint venture relation; that Butler is insol-
vent, is threatening to collect the balance from the corpora-
tion, when paid by the purchaser, and to divert the same
from the funds of said joint venture and appropriate them
to his own use; that he has already appropriated to his own
use the $5,000 collected by him, and that plaintiff is without
adequate remedy at law; that an accounting will show that
Butler is indebted to plaintiff in the sum of $5,000; that the
said option agreement is in Butler's name, but that plaintiff
is, and at all times has been, equally interested therein.
Plaintiff prays that the agreement of joint venture be estab-
lished, confirmed, dissolved, and settled; that Butler be re-
quired to render an accounting, and that plaintiff have judg-
ment for such sum as may be found due him thereon; that
plaintiff have judgment against the corporation, to the use
of himself and Butler as their interests may appear, for the
balance of $5,000.   Plaintiff prays for general relief.

The defendants filed separate answers to the complaint.
The answer of Butler admits that the purchaser paid certain
sums of money on the purchase price of the land, and that
the corporation conveyed the land to the purchaser, taking
a mortgage thereon as security for the sum of $24,000 instead
of $27,500, as alleged in the complaint.   He admits that he
has made no accounting to plaintiff, and alleges that he
is not required to make an accounting, admits that the op-
tion for the purchase and sale of the land is in his name,
denies every allegation of the complaint, except as admitted,
and for a further defense alleges, in substance, that on or
about the 10th day of September, 1923, he was employed by
the corporation to sell the land in question; that he made
diligent efforts to sell the same, and expended large sums
of money in traveling to various places and in advertising
the land for sale but was unable to find a purchaser; that
in his efforts to find a purchaser he stated to the plaintiff
that, if he should find a purchaser for the land, he (Butler)

would compensate him for his services; that he also made a number of like offers to numerous other persons, the compensation to such persons, as well as the plaintiff, to be contingent upon their ability to find a purchaser; that neither he nor the plaintiff was able to find a purchaser, and, after spending considerable money in advertising and trying to make a sale, and entirely failing in such effort, he gave the Milford Realty Company, a real estate firm at Milford, Utah, an option to purchase said land; that said firm found a purchaser, and a sale was consummated, but that plaintiff did not in any manner aid or assist in its consummation, and took no part or interest therein; that plaintiff never was in any manner interested in said option agreement, nor in any fees or commission received as the result of said sale, or in the promissory note given for the balance of the purchase price; that plaintiff has never paid, or offered to pay, the defendant Butler any part or portion of the moneys expended by him in effecting the sale of said lands, and has never given any consideration for the alleged interest or equity claimed herein.

The answer of the defendant corporation is substantially the same as that of the defendant Butler, except as to Butler's affirmative defense.

It may be stated now as well as later that the relation of the corporation to the case appears to be that of a stakeholder only. It was made a party to the action solely for the purpose of securing plaintiff's interest in the unpaid purchase price, in the event that plaintiff recovered judgment against the defendant Butler.

The case was tried to the court without a jury. Findings and judgment were rendered in favor of both defendants, from which judgment plaintiff appeals. The principal error assigned is that the findings are not supported by a preponderance of the evidence.

This is an action in equity, in which it is incumbent upon the court to review the evidence and decide the case according to the facts as we find them to be, bearing in mind legal

presumptions in favor of the judgment. Many of the important facts are not in dispute. It will simplify the statement if at this time we summarize such facts as appear to be uncontroverted.

Defendant Butler, in September, 1922, procured an option from the corporation for the sale of 11,040 acres of land in Iron county at not less than $2.50 per acre net to the corporation, if sold in one parcel. There was some kind of an agreement between Butler and plaintiff in October, 1922, in respect to the disposal of the option or sale of the land. Each of them had separate business in which the other had no financial interest. After the agreement was entered into between them, they procured office rooms together in the same building. They each contributed toward the payment of the rent. Plaintiff's work was mainly in the office, taking care of correspondence, while Butler most of the time was in Salt Lake City and other places. They had one or two items of other business together, but they were of minor importance. The principal business appeared to be the sale of the land. Butler borrowed the sum of $1,000 before going to Salt Lake City, ostensibly for the payment of his expenses while there. Plaintiff, at Butler's request, deposited in the bank at Cedar City to Butler's credit something over $100 to cover Butler's checks while he was in Salt Lake City. Before going to Salt Lake City, Butler executed a power of attorney to plaintiff for the sale of the land, so that, if necessary, a deal could be closed without delay. Plaintiff and Butler corresponded by letter and telephone concerning the sale of the land, and also, to some extent, as to their separate business, each contributing toward this expense. The fact that they corresponded is not in dispute, but they do not entirely agree as to its meaning and effect. The option between Butler and the corporation would have expired December 10, 1922, had it not been renewed. The renewal required a deposit as a guaranty of fulfillment, and plaintiff, at Butler's request, deposited Liberty bonds in the sum of $250, and thereby procured a renewal of the option. An option for the disposal of the land was given by Butler, per-

sonally, to the Milford Realty Company, a real estate firm of Milford, Utah, January 18, 1923, and became effective 5 days thereafter. No money was paid on that option until in March next following. Thereafter other installments were paid, leaving a balance which was secured by a mortgage on the property. Neither plaintiff nor Butler kept any book account of their expenses, nor rendered any account as between themselves; nor did Butler account to plaintiff for any money received on the sale of the option. The relation between plaintiff and defendant, as appears from the record, was at all times friendly and cordial until January 23, 1923, when plaintiff received a letter from Butler which will hereinafter be quoted at length. Plaintiff appeared to defer largely to Butler in their dealings respecting the land, and kept him advised by correspondence as to inquiries made concerning the business.

The ultimate question to be determined is, What was the relation of Butler and the plaintiff? Were they parties to a joint venture in the sale of the land, or was plaintiff a mere employé of Butler, and, if so, what, if any, was the nature and amount of his compensation?

The testimony of the parties themselves is sharply conflicting, and each of them rely on corroborating circumstances in support of their respective contentions. It would be impracticable here to undertake to enumerate all the circumstances relied on, but it is imperatively necessary to state each party's version of the contract under which the business was transacted. Plaintiff's version is that in October, 1922, the Iron County Realty Company, of which he was secretary, desired to employ some person as manager; that at Cedar City he approached Butler in respect to that business, but Butler declined to consider it; that Butler then told him of the option he had from the corporation, and stated that, if plaintiff would help him find a purchaser for the land, he would "treat him right"; that plaintiff accepted the offer, and they immediately took office rooms together; that shortly afterwards they concluded it would be better if Butler would go to Salt Lake City, interview real estate men there,

and see what could be done; that plaintiff was to remain at Cedar City to take care of the correspondence and attend 'to matters at that end of the line; that at this stage of the transaction he asked Butler what he was to get out of it, reminding Butler that he had promised to treat him right; that Butler replied, "If you will stick by me and help me out on this deal, we will deduct the expenses, allow me a salary commensurate with what I have been making, and split the profits"; that Butler said he had been averaging about $200 a month on the sale of cars; that plaintiff accepted the offer and was to work without salary; that his only compensation was to be a share in the profits; that Butler went to Salt Lake City; and that among other things, while there he inserted an advertisement in the Salt Lake Tribune to the effect that Iron County was booming, stating the price of land from $3.50 up, and advising inquirers to write "Butler-Forbes, Cedar City, Utah." Plaintiff further testified that he took care of the correspondence and kept Butler advised; that they were to keep in close touch to avoid conflicts; that he showed two or three prospective purchasers over the land; that he wrote several letters to Butler respecting their business, and received replies thereto. Some of the letters introduced in evidence, written by plaintiff, refer specifically to the land, and manifest an interest in the sale thereof. They indicate, at least, that plaintiff thought he had an interest in the sale. The replies of Butler were not introduced in evidence. Plaintiff testified he left them in the desk when he gave up the office; that he looked for them afterwards, but they were gone. He testified, however, that Butler's replies were "on the same basis." He testified to the effect that his relations with Butler concerning the business were cordial and friendly until he received from Butler the letter of January 23, 1923, to which we have hereinbefore referred. The letter is somewhat lengthy, but appears to be of sufficient importance to quote in extenso:

"Mr. Ray T. Forbes, Cedar City, Utah—Dear Ray: Some one has thrown a monkey wrench into the machinery! Nothing more than that the fellows over here want me close by, expecting something to develop in the next day or so. About the position you

are in of being secretary of the Iron Realty Company, at the same time as assisting me in this deal, I would suggest that you remain firm with the Iron Realty Company and not consider leaving them to go in with me, *as I got some dope over here* which would make it appear you would make a mistake to get out of the Iron Realty Company, and I will tell you more when I see you. About the relationship between us now, there is nothing for you to feel anxious about, as when I make a turn of this 11,000 acres, if I do, I will pay you what I conscientiously can, all parties considered, and I will pay it to you simply as my representative acting for me while I was absent, and you are not in any other capacity with me but as such. This is self-evident, as you could not act in any way contrary to the interests of the company that you are an officer of, and I am the last man in the world that would stand for your so doing, as you well know. I would not consider entering into any arrangements with you at all until your connection with the Iron Realty Company was entirely severed, and, as that would be a mistake, we will dismiss the matter until certain things develop that I have *learned of over* here. Then it will be the other way I expect, in that it will be I that is endeavoring to get into the Iron Realty Company. One thing more. I will protect you in every way in those bonds you put up for me, and, if they should be forfeited, I will return my share of the forfeiture to you and pay you cash for any money you have advanced to me while I was in Salt Lake City. In other words, you will lose nothing in your relationship with me, even if the land is not sold, and the bonds you put up are forfeited. *However, we hope for good news yet*, but I am afraid that some one has queered the works. Don't say a word to Doolittle or any one showing any special interest in the land, and await developments, and keep your spirits up, and stay with the Iron Realty Company.

"Yours truly.

"P. S. My income from selling automobiles will take care of me from now on, and I will not have to ask you for any more loans, I am sure. I closed a guy up to-day. Bill.

"Wm. M. Butler."

This letter appears in the record as Plaintiff's Exhibit H, and for convenience will be so referred to here.

Plaintiff afterwards met Butler at the Cedar Hotel and asked him to go up to his room. Plaintiff referred to Exhibit H, and asked what it meant, as it looked rather peculiar. Butler said: "Nothing whatever. Things are going on just the same as they had." Plaintiff said: "The letter does not seem to indicate it." Butler said: "You need not worry

about it.'' Plaintiff testified that after this letter there was a change in the attitude of Butler. Once of twice plaintiff desired to talk to him. He would say he was busy, and tell plaintiff to wait until the time comes and he would explain; by that he meant wait until there was a sale, and he would explain the details. At this point the transaction will be better understood by reference to the undisputed fact that Butler had given an option to the Milford Realty Company on January 18, 1923, for the sale of the land, which option became operative on January 23d, the very day upon which Exhibit H was written. The first payment thereon was made in March, 1923. Plaintiff testified that Butler, in May, 1923, told him that no money had passed. He told Butler he heard the deal had gone through, and that money had been paid, and wanted to know what he was going to do. Plaintiff told him he was willing to split on less than they had agreed to. Butler asked him what he would split for, and plaintiff said for the same amount he offered him at Lund, $1,000. Butler said: ''You have got your sights pretty high.'' Plaintiff told him if he did not accept his proposition he would settle on the basis agreed to or take it into court. Butler said, ''Go to it, you haven't got a look in.'' There was a conversation afterwards in the office of Woodbury, of the corporation, in which Woodbury urged them to settle their difficulty. Plaintiff testified that at that time Butler admitted owing him something, but not as much as plaintiff claimed. Plaintiff paid the rent for the office for October and November, 1922. In January or February Butler paid the balance due at that time. In January plaintiff was employed as manager of the Cedar Hotel, upon an understanding with Butler that it might be to their advantage. The salary would enable plaintiff to contribute to the payment of expenses.

It appeared upon the cross examination of plaintiff that during the period of these transactions plaintiff was engaged in three or four different capacities by different concerns, but it was claimed by him that some of them were for charity merely, and that none of them required much

of his time. He did not devote all of his time in trying to
sell the land. He testified that the same was true as to
Butler. Plaintiff admitted that in the conversation with
Woodbury he never told him he was interested in the option
with Butler, but told him he was doing the business for
Butler; that that was all they desired Woodbury to know.
Plaintiff never inquired of Butler as to how much he was
expending on the deal. He was willing to rely on Butler's
figures at that time. Plaintiff knew from what Butler told
him that Butler was conducting negotiations with the Mil-
ford Realty Company. He asked Butler several times how
he was coming along. Butler said he could not get much
out of them, but would let plaintiff know. Butler's replies
were not satisfactory along in January after the letter
(Exhibit H) was written. At that time plaintiff's confidence
was shaken by the letter and what people told him. Not-
withstanding that he did not ask for a memorandum. But-
ler had told him everything would go on as it had.

Defendant Butler, called by plaintiff, testified that, at
the time of the advertisement referred to, the only lands he
had the sale of was the 11,040 acres; that the advertisement
was run in the name of Butler-Forbes.

D. E. Kirk, of the Milford Realty Company, testifying for
plaintiff, said the first time he had anything to do with But-
ler respecting the land in question was in the fall of 1922.
Butler wanted to dispose of the 11,040 acres of land. Wit-
ness saw the option. Butler and witness came to terms in
January, 1923. Butler at that time told him others were
interested besides himself. The land was finally sold to A. E.
McGarry and associates at $3.85 per acre in one parcel. The
first payment, $1,750 was in March, 1923; the next, $5,000, in
April; the next, $6,500 in June; and there was some paid
after that. When the first payment was made, Butler said,
"Just keep this quiet to yourself around Cedar," as he did
not want them to know what he was making "Until we got
it straightened up." He said he had to fix it up with
Forbes. Butler spoke of the option as his option. He never
mentioned anyone else as being in with him. When the

third payment was made, he saw Forbes at the hotel in Cedar. Forbes asked him if they had made the deal. He made no claim of interest in the deal at that time, but he did later. Witness said he wanted a 50 per cent. commission from Butler. Butler then told him that other parties were interested with him, and that he had to split with them. That was the reason he gave for not splitting with the witness.

William J. Forbes, testifying for plaintiff, said that some time in December, 1922, he saw Butler in Salt Lake City, and Butler told him that he and Ray (meaning plaintiff) were in the real estate business, trying to put over a deal for 11,000 acres of land. He said he did not know how they were going to pull through. He said Ray was in the hotel and that they were in need of finances. Witness said, "If Ray needs any money, he knows where to get it." Butler mentioned his drug store, and witness promised to look it over when he went down. Witness was with plaintiff when he looked for letters from Butler. They were not there. That was the latter part of February, 1923.

Defendant Butler, testifying in his own behalf, said he received the option from the corporation about September 10, 1922. He advertised in Los Angeles and Chicago papers, took various trips to the southern part of the state and to Salt Lake. He met plaintiff in September, and told him he had an option on a tract of land. After that plaintiff spoke to him about coming into the Iron County Realty Company. Plaintiff was secretary and treasurer. Witness did not go into the realty company. He told plaintiff he would be out of town continually advertising, etc., and, as he was going to Salt Lake City he requested plaintiff to the first two months, witness paid from January on. In October, 1922, when witness was going to Salt Lake City, he told plaintiff that, if he "should be instrumental in selling the land, if some one should come from California, and transmit to him any messages or communications that might come in, and said he would compensate him for it. Plaintiff

said he would be glad to do it. They then took offices together. There was no partnership. Plaintiff paid the rent on his own initiative to the best of witness' knowledge. Witness was examined concerning Exhibit H, his letter to plaintiff hereinbefore quoted, and said that plaintiff spoke to he should use his power of attorney in accordance with my instructions, that I would deduct the expenses and compensation for myself, considering the time I put in, and split." That was based on his handling the man that might come and buy the land. "He was to transmit anything that came in to me." After that Butler went to Salt Lake, and for about three months all he did was work on the 11,000-acre deal. He finally sold it to the Milford Realty Company. Plaintiff had nothing to do with it. He answered no letters him about it afterwards and asked him what it meant; that witness told him it meant they would go no further in their contemplated plans; that plaintiff said, "If that is the way you feel about it, we will quit, and you get my bonds back and give me a note for what you owe me." Witness said: "Ray, if this deal goes through with these parties that we saw in Lund, I want you to participate, but before that I had told him that, if the Lund deal went through, he would get $1,000." As to the Liberty bonds put up by plaintiff to secure a renewal, Butler admitted it was done at his request. He was expecting to substitute other security instead. He afterwards put up a certified check, and had the bonds released to plaintiff. This was March 21, 1923. Witness stated he never told the witness Kirk not to mention the deal to Forbes; that he did request him to not mention it down at Cedar City, and stated certain reasons why such knowledge might be used to his disadvantage in the deal. Butler testified to an agreement with one Miller, with whom he agreed to split in case of a sale by Miller. He mentioned other parties with whom he had a similar arrangement. He also testified that at the time he wrote Exhibit H no definite arrangement has been made with the Milford Realty Company; that he had received no payment, and did not know if the land would be sold; that plaintiff did nothing towards effecting the sale; that he never asked witness re-

specting his expenses and never submitted a statement of money he had expended; that plaintiff expended some money on the 11,000-acre deal for telegrams, gasoline, and wear and tear of his car. Witness did not know the amount. No license was ever procured by plaintiff and Butler as real estate dealers, no stationery was printed as a joint venture, and no telephone listed. Plaintiff was acting for witness. Witness went quite fully into all of his expenditures of time and money in connection with the sale of the land. As no accounting was ordered, such testimony is immaterial to the question we have to determine.

We have endeavored to state a fair synopsis of the main features of the evidence. We have omitted many features of minor importance. The sharp conflict in the testimony of the contending parties renders the case more than ordinarily difficult to decide. The plaintiff is corroborated to some extent by William J. Forbes, who testified that Butler told him that he and Ray (plaintiff) were in the real estate business, and had a deal on 11,000 acres of land. Plaintiff's contention is also strengthened by the witness Kirk, of the Milford Realty Company, who testified that, when he was trying to obtain a larger commission on the deal, Butler refused because he had to split with other parties, and in the same connection Butler said he would have to fix it up with Forbes.

There are numerous circumstances in the case that give color to plaintiff's version of the transaction: If plaintiff had no interest in the option, why would Butler advertise the land in the name of Butler-Forbes? Again, if plaintiff had no interest except as he might find a purchaser and "handle the man," why would plaintiff display so much interest in what Butler was doing in Salt Lake City, and wish him success in respect to the deal as he did in many of his letters to Butler? Why would he assume, in his letters to Butler that he was interested in any deal that Butler might make, and why did not Butler in his replies repudiate the assumption that plaintiff had an interest? Plaintiff testified that Butler's replies were "on the same basis," which

we infer meant acquiescence on Butler's part. Why would plaintiff, who evidently is a man of moderate means, contribute money towards the payment of Butler's expenses in Salt Lake City, if plaintiff had no interest except as he himself might find a purchaser and "handle the man"? Again, why should plaintiff incur the expense and take upon himself the trouble of showing prospective purchasers over the land—purchasers who had evidently come in response to the Butler-Forbes advertisement? On Butler's version of the transaction, plaintiff certainly could not claim an interest in a case of that kind. There are many other circumstances in the case from which inferences may be drawn unfavorable to Butler's contention. It is hardly probable that plaintiff would have put up as a forfeit his last Liberty bonds for the renewal of an option in which his interest was so flimsy and precarious. It was testified to by plaintiff and not denied, that the relationship between him and Butler prior to January 23, 1923, had been uniformly friendly and cordial. There appears to have been no friction whatever between them, nor does there appear to have been any dispute or controversy as to their relations, whatever they were.

Exhibit H, written by Butler to plaintiff on the very day that his option to the Milford Realty Company went into effect, is, to say the least, a strange communication to make to one with whom he had up to that time had no controversy or dispute. As far as the record discloses, it was the first manifestation of any attempt to sever whatever relation had existed before, and that too on the very day that the option to the Milford Realty Company went into effect. Butler commences his letter by saying: "Some one has thrown a monkey wrench into the machinery!" Why could not he have said: "I gave an option to the Milford Realty Company on the 18th inst.; it is in effect to-day; govern yourself accordingly?" That would have been the kind of information plaintiff had a right to receive, whether the agreement was as plaintiff contends or as Butler contends. The sentence we have quoted implied that some one had done something to blast a well-founded

hope, and that the deal was off, whereas it had just been consummated with reasonable prospect of a full fruition. Butler's advice to plaintiff, as appears in Exhibit H, "to remain firm with the Iron Realty Company," instead of going in with Butler, together with his declaration that plaintiff was simply his representative to act for him when absent, has the appearance of attempting to "build up a case." The further thought expressed in the letter that Butler could not conscientiously go in with plaintiff as long as plaintiff was connected with the Iron Realty Company is palpably disingenuous, in view of the record before us, and especially in view of Butler's own version of their business relations. In the first place, the record does not disclose that the realty company was doing any business that would interfere with plaintiff's entering into a joint venture with some third party. But the most convincing circumstance against the assumption that Butler had conscientious scruples about going in with the plaintiff, on account of his relation to the realty company, is found in the fact that, according to Butler's own version of the transaction, he did agree to split with plaintiff on the net profits in the event that plaintiff found a purchaser and effected a sale. Butler knew from the very beginning plaintiff's relation to the realty company, so that we feel justified in finding that in that regard his letter was palpably disingenuous. Near the close of the letter, Butler assures plaintiff that, if the Liberty bonds are forfeited, he will return *his share of the forfeiture to plaintiff*. In view of Butler's contention that plaintiff was only Butler's representative, to act for him in his absence, it is difficult to see why Butler should not have assumed the entire loss in case of forfeiture instead of only "his share."

Notwithstanding there are other features of Exhibit H which, considered with the entire record, tend to show the mala fides of the defendant Butler, we cannot afford to devote further space to their consideration. Butler's counsel, in his brief, ably presented every circumstance that can be urged for an affirmance of the judgment. It is contended

Forbes v. Butler et al., 66 Utah 373

that the contract relied on by plaintiff is indefinite and uncertain, and that the law in such case requires that a contract of joint venture or partnership should be definite, certain, and free from ambiguity. There is no doubt that such is the law. We are of opinion, however, that, if plaintiff's evidence is to be believed, a contract of joint venture was entered into between the parties sufficiently definite to satisfy the law. Counsel explains the advertisement in the Salt Lake Tribune by referring to Butler's testimony to the effect that he had a drug store to sell, and that Pace, for whom Forbes was manager, had a truck line to sell, so that he advertised in the name of Butler-Forbes. That is a fair explanation, as far as concerns the drug store and truck line. The land, however, was not included in that advertisement, but in a separate and distinct paragraph in the name of Butler-Forbes. The explanation does not explain the matter which requires explanation. However, if the advertisement was the only circumstance in the case in corroboration of plaintiff's version of the transaction, it would be entitled to much less consideration. Much criticism is indulged in by counsel, because plaintiff did not require a written memorandum of the agreement. That such criticism is justified cannot be denied. It is seldom that an agreement involving a deal of such magnitude is permitted to rest entirely in parole. But plaintiff says he was not in the habit of having agreements reduced to writing, and that he had confidence in Butler that he would do what he said. Such cases occur much oftener than one would ordinarily expect, and the only effect of it is that it renders it more difficult for the party upon whom rests the burden of proof. The question here is, Has plaintiff, notwithstanding that handicap, sustained the burden of proof? The point is also made that, in the conversation between plaintiff and Butler, at which Woodbury was present, plaintiff did not claim to be a partner in the deal. It is true that ordinarily the silence of one when he ought to speak is a circumstance that may be subsequently used against him. The evidence as to what was

said in the conversation referred to is conflicting. Assuming that counsel's version as to what was said is true, still the fact that plaintiff remained silent and did not declare his partnership relation is by no means conclusive, nevertheless it is entitled to consideration. The point is also urged that plaintiff kept no account of his expenditures, and did not require that Butler should. It appears that Butler kept no account himself, nor did he require plaintiff to do so. Under whatever agreement the business was carried on, whether as claimed by plaintiff or as claimed by Butler, it was as incumbent upon one as upon the other to keep an account. The only inference that can be drawn is that each of the parties had confidence in the other that when the time came for settlement each would render a fair account. Such at least was the position taken by plaintiff as disclosed by the record.

We have carefully considered every point presented in the briefs of counsel, and have expressed our views upon such as appeared to have any merit. While it is manifest from the record that the trial court endeavored to be fair and impartial in the trial of the case and render a judgment in accordance with the law and the evidence as he understood it, yet we are forced to the conclusion that the finding to the effect that plaintiff and defendant Butler did not enter into a joint venture, with respect to the sale of the land, is against the clear preponderance of the evidence, notwithstanding legal presumptions in favor of the finding.

There are no controverted questions of law involved. A joint venture is in the nature of a partnership, ordinarily, but not necessarily, limited to a single transaction. The law of partnership applies as far as substantial rights are concerned. 33 C. J. 841 et seq.

It is contended by his counsel that Butler incurred expenses in effecting a sale of the land to the extent of several thousand dollars. Whatever legitimate expenses were incurred in connection with the joint venture by either party to the contract will be, in the first instance, for the trial court to determine.

It is therefore ordered that the agreement of joint venture between the plaintiff and defendant Butler referred to in the pleadings be, and is hereby, established and confirmed; that an accounting between the parties should be had for the purpose of determining the net profits, if any, resulting from the joint venture; that the cause be remanded to the trial court, with directions to proceed accordingly to determine such net profits, if any, after allowing Butler compensation commensurate with what he had been making, and, if net profits are found, to adjudge that each of the parties to said joint venture agreement be entitled to one-half thereof, and enter judgment accordingly. The findings of the trial court in conflict herewith are hereby vacated and set aside, with directions to substitute findings in lieu thereof in accordance with the views herein expressed; defendant Butler to pay the costs on appeal.

GIDEON, C. J., and FRICK, CHERRY, and STRAUP, JJ., concur.